USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/27/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

DENNIS FAGAN,

                Plaintiff,

           -against-

MOUNT VERNON CITY SCHOOL

DISTRICT, et al.

                Defendants.

-----------------------------------------------------------------X

7:25-cv-00927-VR

**OPINION & ORDER**

**VICTORIA REZNIK, United States Magistrate Judge:**[1]

## I.      INTRODUCTION

Dennis Fagan ("Plaintiff") brings racial discrimination, retaliation, and hostile work environment claims against his former employer Mount Vernon City School District (the "School District") and four of its employees (collectively, "Defendants"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL"). Pending before the Court is Defendants' motion, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint for failure to state a claim. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

---

[1] On July 10, 2025, the parties consented to jurisdiction before a Magistrate Judge for all purposes, under 28 U.S.C. § 636(c). (ECF No. 29).

## II.    FACTUAL BACKGROUND[2]

### A.  Plaintiff's Hiring and Initial Workplace Dynamics (Aug.–Sept. 2022)

Plaintiff, a self-described "White American male," was hired on August 15, 2022, as Director of Security for the School District, a "predominantly minority school district." (ECF No. 1 ¶¶ 11, 28).[3] In this role, Plaintiff was responsible for security across sixteen schools and supervised over 100 security officers. (*Id.* ¶ 29).

On his first day, Plaintiff met Rick Anderson, the Lead Security Officer, who is Black. (*Id.* ¶¶ 33–34). Anderson complained to Plaintiff that the School District had been wrong to fire Plaintiff's predecessor. (*Id.* ¶ 34). Plaintiff alleges that other security officers warned him to "watch [his] back" because Anderson "ran everything." (*Id.* ¶ 35).

Two weeks later, when Plaintiff moved into his office, he discovered that no files had been left for him. (*Id.* ¶ 36). Although his secretary initially helped him acclimate, she was later removed and replaced without notice by Acting Superintendent K. Veronica Smith ("Defendant Smith"), Plaintiff's supervisor. (*Id.* ¶¶ 18, 37–38).

### B.  Plaintiff's Complaints and Subsequent Meeting with Defendants Pierce and Jones (Fall 2022)

Soon after his hiring, Plaintiff began raising concerns about certain security officers' attendance practices. (ECF No. 1 ¶ 39). He learned that some officers were

---

[2] The following facts are drawn from the Complaint, (ECF No. 1), unless otherwise stated, and for purposes of this motion are accepted as true and construed in the light most favorable to Plaintiff.
[3] All page numbers to documents filed on ECF refer to ECF pagination, printed in blue on the top of each page.

arriving late, leaving early, or taking extended lunch breaks. When Plaintiff questioned security officers Anita Gardner and Shawn Barnes—both Black—about their hours, they responded that their arrangements had been approved by Anderson. (*Id.*). When Plaintiff then raised the issue with Anderson, Anderson allegedly "became very angry," complained about people making changes, and walked out of Plaintiff's office "in a disrespectful and insubordinate way." (*Id.* ¶ 40). Plaintiff then overheard Anderson tell other security officers in his office that Plaintiff "was starting shit." (*Id.* ¶ 41). Soon after, Plaintiff issued Anderson a written warning for insubordination. (*Id.* ¶ 42).

Plaintiff was told that his complaint about Anderson would be handled by Assistant Superintendent Beverly Jones ("Defendant Jones"), who is Plaintiff's supervisor, and Principal Pauline Pierce ("Defendant Pierce"), who is Black and allegedly "very good friends" with Anderson. (*Id.* ¶¶ 19–20, 42). About two weeks after writing up Anderson, Plaintiff was ordered to Defendant Pierce's office for a meeting attended by Pierce, Jones, and Anderson. (*Id.* ¶ 45). Plaintiff alleges that Pierce and Jones interrogated him about why he wrote up Anderson. (*Id.* ¶ 46). When Plaintiff explained that Anderson had a negative attitude and disparaged him to other security officers, "[a]ll three individuals began to laugh." (*Id.*). As Plaintiff left the meeting, he heard Pierce and Jones continuing to laugh. (*Id.*).

Plaintiff reported this incident and how he was treated to Acting Assistant Superintendent Mark Raimondi, who allegedly told him to "let it go because he was not going to win because of his race." (*Id.* ¶ 47).

Plaintiff further alleges that, around this same time, Defendant Pierce began marginalizing him by excluding him from her security meetings and telling him that she would give all information to Anderson, his subordinate. (*Id.* ¶ 43). Plaintiff also claims that Pierce would pass by Plaintiff's office every day and "berate him" about staffing issues and then walk away when Plaintiff tried to explain. (*Id.* ¶ 44).

### C. Additional Complaints and Union Grievance (Dec. 2022-Jan. 2023)

On December 1, 2022, Plaintiff learned that security officer Roosevelt Scott, who is Black, was allegedly not coming to work despite being paid. (ECF No. 1 ¶ 48). Plaintiff reported this misconduct to Defendants Jones and Pierce, who told Plaintiff they would investigate, but Plaintiff received no follow-up response from either. (*Id.*).

On December 7, 2022, the grievance chairperson of the Mount Vernon Federation of Teachers (the "Union") notified Plaintiff that some lead officers were owed stipends and that Plaintiff should notify payroll to make necessary adjustments. (*Id.* ¶ 49). Plaintiff consulted the head of Human Resources ("H.R."), who eventually recommended that Plaintiff "move the lead officers around" so that there would be no need for them at the schools. (*Id.* ¶¶ 50–51). The Union disagreed with the recommendation. (*Id.* ¶ 52).

On January 26, 2023, the Union filed a Level One Grievance against Plaintiff about the stipends. (*Id.* ¶ 53). Although H.R. advised Plaintiff that Defendant Jones should attend the grievance hearing with him, Jones allegedly told him on the

phone to "handle it himself." (*Id.*). When Plaintiff told Jones that he didn't have authorization to give raises, Jones allegedly replied, "neither do I," and hung up. (*Id.*) This caused Plaintiff to have no representation at the grievance hearing "should it be scheduled in the future." (*Id.*). Plaintiff asserts that similarly situated individuals were never denied representation at grievance hearings from the School District. (*Id.* ¶ 54).

### D. Age-Based Transfer Directives (Sept.–Oct. 2023)

Around late September or early October 2023, Defendant Pierce allegedly ordered Plaintiff to transfer three high school security officers to a grammar or middle school, "because they were too old" to do the job at the high school. (ECF No. 1 ¶ 55). Plaintiff refused, stating that such transfers would constitute age discrimination. (*Id.* ¶ 56). Pierce responded by telling him to "just do your job." (*Id.*).

Later that day, Plaintiff learned that Defendant Smith also wanted to transfer two officers and re-assign them to video monitoring duties "because of their ages." (*Id.* ¶ 58). When Plaintiff confronted Smith about the transfer, she refused to speak with him. (*Id.* ¶ 59).

### E. Escalation of Conflict (Oct. 2023)

On October 4, 2023, Plaintiff received a call from Lynne Middleton ("Defendant Middleton"), a Black member of the Board of Education at the School District. (ECF No. 1 ¶¶ 21, 64). Defendant Middleton told Plaintiff that she heard he was a racist and asked him, "Are you a racist?" (*Id.* ¶ 64). Plaintiff advised her

that some officers—Gardner, Barnes, and Anderson—disliked him for trying to hold them accountable for their job and misrepresenting their hours on their time sheets. (*Id.*).

On October 18, 2023, Defendant Jones called Plaintiff into her office and asked him who he believed might file a complaint against him. (*Id.* ¶ 61). Plaintiff replied that it would likely be the three individuals—Gardner, Barnes, and Anderson—whom he had accused of poor performance and insubordination. (*Id.*). The next day, Jones again called Plaintiff into her office and asked him why he was "picking on certain people." (*Id.* ¶ 62). When Plaintiff asked her what she meant by her question, Jones responded, without elaborating, "You remind me so much of Donald Trump." (*Id.*). Plaintiff "felt embarrassed and humiliated by the comment," which was made in front of Jones's secretary. (*Id.* ¶ 63).

That same week, Plaintiff encountered Barnes and other officers in a high school lobby during a training session. (*Id.* ¶ 65). Plaintiff directed them to attend the training but noticed that Barnes was still in the hallway. (*Id.*) After again directing Barnes to attend the training, Barnes allegedly replied, "Fuck you white mother fucker." (*Id.*).

Plaintiff reported this incident with Barnes to Raimondi, the Acting Assistant Superintendent, who told Plaintiff, "Let it go." (*Id.*). At a subsequent meeting on October 20, 2023, Raimondi allegedly told Plaintiff to leave Barnes and Gardner alone because they had family members who were close to Defendant

6

Middleton, and Raimondi, who wished to become a permanent Assistant Superintendent, wanted to avoid any trouble with the school board. (*Id.* ¶ 67).

### F. Plaintiff's Transfer and Termination (Oct. 20–23, 2023)

On October 20, 2023, Plaintiff was told that his office would be moved for a few months to another school. (ECF No. 1 ¶ 68). Plaintiff alleges that in retaliation for his complaints about officer misconduct and his refusal to carry out age-based transfers, Defendant Smith transferred him to video monitoring. (*Id.* ¶ 69). Although Plaintiff had previously suggested relocating video monitoring into his office, he was moved out once the system was installed. (*Id.*). Plaintiff also alleges that Defendant Smith refused to meet with him to discuss his ongoing concerns about certain security officers. (*Id.*).

On October 23, 2023, Plaintiff was fired from the School District. (*Id.* ¶ 79). Plaintiff alleges that he learned he was being fired "because the union falsely accused Plaintiff of creating a hostile work environment for some of its members." (*Id.* ¶ 70).

### III.    PROCEDURAL HISTORY

On August 8, 2024, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission (the "EEOC") alleging racial discrimination, retaliation, and a hostile work environment against Defendants. (ECF No. 1 ¶¶ 8–9). After the EEOC issued a notice of right to sue on November 15, 2024, Plaintiff commenced this suit in federal court on January 31, 2025. (*Id.* ¶ 10).

In the Complaint, Plaintiff asserts claims for racial discrimination, retaliation, and hostile work environment against the School District under Title VII (Counts 1–3); against all Defendants under the NYSHRL (Counts 4–6); and against the individual Defendants—K. Veronica Smith, Beverly Jones, Pauline Pierce, and Lynne Middleton—under Section 1983 (Count 7). Defendants move under Rule 12(b)(6) to dismiss all claims. (ECF No. 23).

## IV.    LEGAL STANDARD

To survive dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "When there are well-pled factual allegations [in the complaint], a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although a court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, this tenet is "inapplicable to legal conclusions." *Id.* at 678. A court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether a plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558.

8

"Under *Iqbal* and *Twombly,* … in an employment discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). A plaintiff has the burden of proving intentional discrimination either directly "through direct evidence of intent to discriminate" or indirectly by "showing circumstances giving rise to an inference of discrimination." *Id.* at 87 (citations omitted). A plaintiff may prove intentional discrimination indirectly "either by meeting the requirements of *McDonnell Douglas* and showing that the employer's stated reason for its employment action was pretext to cover-up discrimination, or by otherwise creating a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* (internal quotation marks and citations omitted).

Courts "analyze Title VII and Section 1983 discrimination claims under the familiar three-step burden-shifting framework articulated in *McDonnell Douglas*." *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under the *McDonnell Douglas* framework, (1) a plaintiff "bears the initial burden of establishing a prima facie case by producing enough evidence to support an inference of discriminatory motive"; (2) the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection"; and (3) if the employer articulates such a reason, a plaintiff is afforded a "fair opportunity to show that the stated justification

9

was in fact pretext for discrimination." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025) (internal quotation marks and citations omitted).

But in the initial stage of a Title VII litigation, "a plaintiff is not required to plead a prima facie case under *McDonnell Douglas,* at least as the test was originally formulated, to defeat a motion to dismiss." *Vega*, 801 F.3d at 84. *See also Littlejohn v. City of New York*, 795 F.3d 297, 308 (2d Cir. 2015) ("[T]he standard espoused by the *McDonnell Douglas* line of cases for prima facie sufficiency was 'an evidentiary standard, not a pleading requirement.'" (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 510 (2002)). In the initial phase of litigation, "we focus only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*." *Id.* at 312. "The facts required by *Iqbal* to be alleged in the complaint … need only give plausible support to a minimal inference of discriminatory motivation." *Id.* at 311. A plaintiff's "showing of a prima facie case of discrimination at the first step [of the *McDonnell Douglas* framework] suffices to defeat a motion to dismiss." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, No. 19-CV-3257 (JPO), 2020 WL 4038350, at *4 (S.D.N.Y. July 17, 2020), *aff'd on other grounds*, 6 F.4th 293 (2d Cir. 2021).

## V.    DISCUSSION

Plaintiff asserts claims for racial discrimination, retaliation, and hostile work environment against the School District under Title VII (Counts 1–3); against all Defendants under the NYSHRL (Counts 4–6); and against the individual Defendants in their individual capacities under Section 1983 (Count 7). Defendants

10

move to dismiss all claims for failure to state a claim under Rule 12(b)(6) and, with respect to Plaintiff's state-law claims, for failure to comply with the notice requirements of Municipal Law 50-e and Education Law § 3813. (ECF No. 24).

The Court first addresses Plaintiff's discrimination, retaliation, and hostile work environment claims under Title VII, and then each claim under Section 1983 against the individual Defendants. Finally, the Court determines whether the notice requirements bar Plaintiff's claims under the NYSHRL and, if not, whether Plaintiff fails to state a claim under Rule 12(b)(6).

## A. Discrimination Claim Under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "[T]o properly assert a claim of discrimination against an employer under Title VII, a plaintiff must allege two elements: (1) the employer discriminated against [her] (2) because of [her] race, color, religion, sex, or national origin." *Buon*, 65 F.4th at 78 (internal quotation marks and citation omitted).

A "disparate treatment claim under Title VII … is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." *Littlejohn*, 795 F.3d at 312 (citation omitted). "[F]or a discrimination claim to survive a motion to dismiss, absent direct evidence of discrimination," a plaintiff must allege facts in

the complaint that plausibly support that the plaintiff (1) "is a member of a protected class," (2) "was qualified," (3) "suffered an adverse employment action," and (4) "has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Buon*, 65 F.4th at 79 (internal quotation marks and citation omitted).

As an initial matter, Defendants concede for purposes of this motion that Plaintiff was an employee of the School District. (ECF No. 24 at 8). And the parties do not dispute that Plaintiff is a member of a protected class. (*Id.* at 9–10, 12). *See Ames*, 605 U.S. at 309 ("Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs."). Nor do the parties dispute that Plaintiff was qualified for his position. (ECF No. 24 at 9–10). *See Martin v. City Univ. of New York*, No. 17 CIV. 6791 (KPF), 2018 WL 6510805, at *8 (S.D.N.Y. Dec. 11, 2018) ("To be qualified for a position under Title VII, an employee must not only be capable of performing the work; she must also satisfy the employer's conditions of employment." (internal quotation marks and citation omitted)).

The Court will thus focus on the third factor, whether Plaintiff plausibly alleges an adverse employment action, and the fourth inquiry, whether Plaintiff sufficiently pleads facts to offer minimal support for an inference of discriminatory motivation.

### 1. Plaintiff plausibly alleges an adverse employment action.

Defendants argue that Plaintiff fails to plead sufficient facts to allege an adverse employment action, except for termination, because none of the alleged actions had an impact on a term or condition of his employment. (ECF No. 24 at 10). The Court agrees that most of Plaintiff's allegations fail to state an adverse employment action. But, as explained below, at least two of them do: (1) Plaintiff's termination and (2) Plaintiff's transfer to video monitoring. That is enough for Plaintiff to meet his minimal pleading burden at this early stage.

In a discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms and conditions of employment." *Buon*, 65 F.4th at 79 (internal quotation marks and citation omitted). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* at 79 (citation omitted). "Any decision by an employer, including the denial of a workplace opportunity that materially affects the terms and conditions of employment, can constitute an adverse employment action." *Id.* at 80 (citations omitted).

But "[a]n adverse employment action must be more disruptive than a mere inconvenience." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019). Indeed, "many negative personnel actions taken by employers do not constitute adverse employment actions sufficient to establish a prima facie case of employment

discrimination." *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 112 (S.D.N.Y. 2022). For example, "[h]arsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment." *Fox*, 918 F.3d at 72.

Here, Plaintiff adequately pleads that he suffered an adverse employment action: the termination of his employment. (ECF No. 1 ¶ 79). Nor do Defendants dispute that Plaintiff's termination constitutes an adverse employment action. (ECF No. 24 at 10, n.2). Indeed, "it is … well settled that firing and reassignment with significantly different responsibilities constitute adverse employment actions." *Buon*, 65 F.4th at 80 (internal quotation marks and citations omitted) (collecting cases).

Plaintiff also sufficiently alleges that his transfer to video monitoring constitutes an adverse employment action. (ECF No. 1 ¶ 69). For a forced job transfer to qualify as an adverse employment action, an employee need not show that the harm incurred was "significant, serious, or something similar," but only "that the transfer brought about some disadvantageous change in an employment term or condition." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 350, 353–54 (2024) (internal quotation marks omitted). Drawing all reasonable inferences in his favor, Plaintiff adequately alleges that a transfer to video monitoring would bring about a disadvantageous change in an employment term or condition. (ECF No. 1 ¶ 69). Based on his allegations that two security officers were directed to be transferred and re-assigned to the video monitoring room because of their age, but

14

neither wanted to do so, one can reasonably infer that such a transfer is undesirable because it would lead to significantly different, if not diminished, responsibilities. (*Id.* ¶¶ 58–60).

But Plaintiff's other purported adverse employment actions lack a tangible effect on his employment term or condition and thus do not constitute adverse employment actions. (ECF No. 34 at 10). One set of purported adverse employment actions relate to verbal reprimands. For example, Plaintiff alleges that Defendant Pierce "berate[d]" him for not having all security posts manned without listening to his explanation, (ECF No. 1 ¶ 44), and in a meeting, Defendants Pierce and Jones interrogated Plaintiff as to why he wrote up Anderson and then laughed at him, (*id.* ¶ 46). But verbal reprimands that do not "result[] in disciplinary action or a reduction in salary, benefits, or other responsibilities"—absent in Plaintiff's allegations here—are not adverse employment actions. *Fox*, 918 F.3d at 72. *See also Dawson v. City of New York*, No. 09cv5348 (PGG), 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013) ("[C]ourts in this circuit have found that reprimands ... and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (citation omitted) (collecting cases)).

Other purported adverse employment actions relate to decisions or actions by supervisors that made Plaintiff feel marginalized, unsupported, or ignored. (ECF No. 34 at 10). For example, Plaintiff alleges that his former secretary was replaced without prior notice, (ECF No. 1 ¶ 38); that he felt marginalized by Defendant

15

Pierce because she didn't invite him to her security meetings and instead passed information through his subordinate Anderson, (*id.* ¶ 43); that Defendant Smith refused to speak with him about the order to transfer security officers to the video monitoring room due to their age and about the alleged misconduct of some of the officers, (*id.* ¶¶ 59, 69); and that Defendant Jones refused to represent him at a grievance hearing, "should it be scheduled in the future," (*id.* ¶ 54). But Plaintiff fails to allege how any of these actions or decisions had a material effect on his employment term or condition. *See, e.g.*, *Alvarado*, 631 F. Supp. 3d at 113–14 (finding that "micromanagement and being written up," "being left out of important supervisory matters and denied sufficient staff support," and "being undermined in her daily responsibilities" did not constitute adverse employment actions). Indeed, even with the grievance hearing, which arguably could have had a material impact on Plaintiff's employment, Plaintiff does not allege whether the grievance hearing occurred and, if so, how a lack of representation by the School District resulted in any material effect on his employment, such as disciplinary action or a reduction in salary or benefits. (ECF No. 1 ¶¶ 53–54).

Finally, among Plaintiff's allegations of adverse employment actions, Plaintiff also points to Defendants' failure to properly investigate and discipline the security officers he had complained about for alleged misconduct. (*Id.* ¶¶ 74, 76). These complaints include those lodged against Anderson for insubordination, (*id.* ¶ 42), against Scott for misrepresenting hours worked, (*id.* ¶ 48), and against Gardner and Barnes for poor work performance and abusing their hours, (*id.* ¶¶ 39, 61, 64). But,

16

again, Plaintiff fails to allege that Defendants' failure to investigate these complaints and discipline the officers in question materially affected the terms and conditions of his employment. Indeed, courts in this Circuit have consistently held that failure to investigate a plaintiff's complaint is not an adverse employment action. *See, e.g., Day v. City of New York*, No. 15cv4399(GBD)(HBP), 2015 WL 10530081, at *8 (S.D.N.Y. Nov. 30, 2015), *report and recommendation adopted*, No. 15cv04399(GBD)(HBP), 2016 WL 1171584 (S.D.N.Y. Mar. 22, 2016) (finding that plaintiff's allegation that defendants failed to investigate plaintiff's complaint did not qualify as adverse employment action) (collecting cases).

Thus, at this early stage of the case, Plaintiff adequately alleges that he suffered adverse employment actions from (1) his transfer to video monitoring and (2) the termination of his employment. Although his other "allegations of discrimination … do not independently constitute adverse employment actions, [they can nevertheless] provide relevant background evidence by shedding light on Defendant's motivation and … provide a contextual basis for inferring discrimination." *Vega*, 801 F.3d at 88–89.

### 2. Plaintiff sufficiently pleads a minimal inference of discriminatory motivation.

Defendants argue that Plaintiff fails to plead sufficient facts to plausibly suggest a causal link between any adverse employment action and his race, relying only on conclusory assertions of discriminatory motive. (ECF No. 24 at 12). To plausibly plead that either his transfer to video monitoring or termination was

17

motivated, in part, by discriminatory intent, Plaintiff must "alleg[e] facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87. Because "[t]he discrimination complaint, by definition, occurs in the first stage of the litigation," it "must be viewed in light of the plaintiff's minimal burden to show discriminatory intent." *Littlejohn*, 795 F.3d at 311. Given this minimal burden at the motion-to-dismiss stage, the Court finds that Plaintiff's allegations meet the minimum threshold necessary to establish a plausible inference of discrimination under Title VII.

"In this Circuit, the *sine qua non* of a national origin or race-based discrimination suit is that the discrimination must be *because of* [the plaintiff's protected characteristic]," meaning the protected characteristic was "a substantial or motivating factor contributing to the employer's decision to take the action." *Buon*, 65 F.4th at 82–83 (internal quotation marks and citation omitted). "[A] plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by [either] alleging facts that *directly* show discrimination *or* facts that *indirectly* show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 83 (citation omitted). Circumstances giving rise to an inference of discrimination include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of

18

events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (citation omitted).

Here, Plaintiff alleges a series of actions and statements by his supervisors leading up to his transfer and ultimate termination that are just barely enough to plausibly create a "mosaic of intentional discrimination … that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (internal quotation marks and citation omitted). As alleged, no action or verbal statement, standing alone, would suffice, but together they plausibly support a minimal inference of discriminatory bias. As alleged by Plaintiff, when he raised concerns about alleged misconduct of certain Black security officers, including his subordinate Anderson, his supervisors did not take his complaints seriously. (ECF No. 1 ¶¶ 46, 48, 64, 65). Instead, in a meeting in Defendant Pierce's office, Plaintiff alleges that Defendants Pierce and Jones interrogated and laughed at him for raising the issue. (*Id.* ¶ 46). And when Plaintiff reported this mistreatment to Raimondi, the Acting Assistant Superintendent, he allegedly told Plaintiff to "let it go because he was not going to win because of his race." (*Id.* ¶ 47). This statement explicitly refers to Plaintiff's race as a reason to give up on his complaint, either against his supervisors or the Black security officers, supporting a minimal inference of discriminatory motive.

This inference is bolstered by the series of events that unfolded in the month of Plaintiff's transfer and termination. As alleged by Plaintiff, in a phone call on October 4, 2023, Defendant Middleton (a member of the Board of Education) accused Plaintiff of being a racist, asking him, "Are you a racist?" (*Id.* ¶ 64). As part

19

of the discussion, Plaintiff defended himself by explaining that certain Black security officers are calling him a racist for trying to hold them accountable for poor work performance and misrepresenting their work hours. (*Id.*). On October 18, 2023, Defendant Jones told Plaintiff that the Black security officers whom Plaintiff had reported for misconduct lodged a complaint against him. (*Id.* ¶ 61). Again, rather than taking Plaintiff's complaints seriously, Defendant Jones allegedly asked Plaintiff why he picked on certain people and told him he reminded her of Donald Trump. (*Id.* ¶ 62). And when Plaintiff complained on October 18, 2023, about Barnes (one of the Black security officers he had earlier accused of misconduct) for telling Plaintiff, "Fuck you white mother fucker," Raimondi again told Plaintiff to "let it go." (*Id.* ¶ 65). Raimondi also allegedly told Plaintiff to leave Barnes and another Black security officer alone "because they had family members who were very close" to Defendant Middleton, a Board of Education Trustee. (*Id.* ¶ 67). Days later, Plaintiff was transferred to video monitoring and then terminated on October 23, 2023. (*Id.* ¶¶ 68–70).

Thus, Defendants' racially inflected comments, combined with the sequence of events leading to Plaintiff's transfer and termination, plausibly give rise to a minimal inference that either adverse employment action was motivated, at least in part, by racial bias. Other courts in this Circuit have found similar factual allegations sufficient for plaintiffs to meet their "minimal burden to show discriminatory intent." *Littlejohn*, 795 F.3d at 311. *See, e.g.*, *Small v. New York City Dep't of Educ.*, 650 F. Supp. 3d 89, 98 (S.D.N.Y. 2023) (finding plaintiff-teacher

pleaded sufficient facts to infer discriminatory motivation based on school principal's remark that she did not like plaintiff "because [he is] gay," which was enough to cast principal's actions in lead-up to plaintiff's termination as motivated partly by anti-gay animus); *Adeniji v. Harman Firm, LLP*, No. 19-CV-8032 (VSB), 2022 WL 254939, at \*6–\*7 (S.D.N.Y. Jan. 27, 2022) (finding plaintiff adequately pleaded racial discrimination claim where supervisor criticized plaintiff's performance in ethnically degrading terms followed by poor performance evaluations, as well as sequence of events leading to his discharge, including making plaintiff an outcast and arbitrarily criticizing plaintiff); *Yang v. Dep't of Educ. of the City of New York*, No. 14cv7037(SLT)(RLM), 2016 WL 4028131, at \*7–\*8 (E.D.N.Y. July 26, 2016) (holding plaintiff alleged enough facts to state plausible claim of discrimination based on supervisor's frequent remarks pointing out that plaintiff was Chinese and had an accent, combined with fact that the supervisor authored negative observation reports that ultimately led to plaintiff's termination).

Defendants argue that Plaintiff fails to plausibly state a causal link between his termination and race, because by his own allegation, his termination had nothing to do with his race. (ECF No. 24 at 12). Specifically, Plaintiff alleges that he was fired because the union falsely accused him of creating a hostile work environment. (ECF No. 1 ¶ 70). But the fact that "there may be other explanations for the defendants' employment decisions does not render [plaintiff's] allegations of discrimination inadequate as a matter of law." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). "Whether there existed non-pretextual, non-discriminatory

explanations for the defendants' employment decisions—a question as to which the defendants bear the burden of production—is not properly decided on a motion to dismiss for failure to state a claim." *Id.* at 230–31 (citation omitted).

Thus, the Court finds that Plaintiff has alleged sufficient facts to meet his burden to plausibly state a discrimination claim under Title VII. Accordingly, the motion to dismiss the discrimination claim under Title VII against the School District is DENIED.

## B. Retaliation Claim Under Title VII

Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against any of his employees or applicants … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Retaliation claims are "analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." *Littlejohn*, 795 F.3d at 315 (citation omitted). To establish a presumption of retaliation under Title VII, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 315–16 (citation omitted). "As with our analysis of the disparate treatment claim, the allegations in the complaint need only give plausible support to the reduced

prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Id.* at 316.

Here, Defendants only challenge whether Plaintiff sufficiently alleges (1) that he engaged in protected activity and (2) a causal connection between his protected activity and the alleged adverse employment actions. (ECF No. 24 at 14–15). The Court addresses each of these in turn.

### 1. Plaintiff sufficiently alleges that he engaged in protected activity known by the School District.

Plaintiff alleges that he engaged in protected activity by opposing race-based favoritism relating to his complaints about Black officer's misconduct, by raising complaints about implicit bias against himself, and by refusing biased directives relating to age discrimination, which he documented to his superiors. (ECF No. 34 at 12). Defendants argue that these allegations do not constitute protected activity under Title VII. (ECF No. 24 at 15–18). The Court disagrees in part. As explained below, informal and formal complaints about discriminatory employment practices are protected activities under Title VII, and Plaintiff alleges just enough facts to meet his minimal pleading burden at this early stage.

Title VII's anti-retaliation provision contains both an opposition and a participation clause. *Littlejohn*, 795 F.3d at 316. The opposition clause prohibits retaliation against an employee "because she opposed any practice made unlawful by Title VII," while the participation clause protects individuals who have "made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under" the statute. *Id.* at 316 (internal quotation marks and citations omitted). Title VII's opposition clause protects both formal and informal complaints to management about discriminatory employment practices. *Id.* at 317. Plaintiffs need not demonstrate that the conduct they opposed actually violated Title VII, but only that they "possessed a good faith, reasonable belief" that the employer's conduct was unlawful under the statute. *Cooper v. New York State Dep't of Lab.*, 819 F.3d 678, 680–81 (2d Cir. 2016) (internal quotation marks and citations omitted). Also, pleading general corporate knowledge of protected activity, such as through complaints to management, suffices to satisfy the knowledge element of a retaliation claim. *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 256 (S.D.N.Y. 2024) (internal quotation marks and citation omitted); *accord Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 723 (E.D.N.Y. 2015) ("Title VII … protect[s] employees who make informal protests of discrimination, including complaints to management." (citations omitted)).

Here, Plaintiff plausibly alleges that he engaged in protected activity through his two informal complaints of discriminatory treatment to Acting Assistant Superintendent Raimondi. First, Plaintiff alleges that he complained about his discriminatory treatment during a meeting where Defendants Pierce and Jones interrogated and ridiculed him in front of his subordinate Anderson. (ECF No. 1 ¶¶ 45–47). According to the Complaint, Raimondi told Plaintiff to "let it go because he was not going to win because of his race." (*Id.* ¶ 47). At the pleading stage, one can reasonably infer that Plaintiff had a good faith, reasonable belief that he was

24

opposing race-based discrimination, particularly because he alleges that Defendants dismissed his concerns about misconduct by certain Black security officers and instead ridiculed him, allegedly in part because of his race. That inference is reinforced by Plaintiff's allegation that Defendant Jones later asked Plaintiff why he picked on certain people, referring to the Black security officers he had accused of misconduct, and then compared Plaintiff to Donald Trump. (*Id.* ¶ 62). These allegations plausibly support both his protected opposition to his discriminatory treatment and corporate knowledge of that opposition.

The same is true of Plaintiff's second complaint to Raimondi on October 18, 2023, after Barnes directed a racially charged expletive at him. (*Id.* ¶ 65). After complaining about Barnes' remark, Raimondi again told Plaintiff to "let it go." (*Id.*). Plaintiff's complaint about Barnes' racially charged expletive in the workplace constitutes opposition to conduct he could reasonably believe to be unlawful discrimination. Although Raimondi did not expressly refer to race when he again told Plaintiff to "let it go," a reasonable inference may be drawn—particularly in light of his earlier remark—that Raimondi understood Plaintiff's complaint as race-based. Within days of this incident, Plaintiff was transferred to video monitoring and then terminated on October 23, 2023. (*Id.* ¶¶ 68–70).

But Plaintiff's other purported protected activities—complaints about Black officers' alleged misconduct, opposition to the School District's handling of those complaints, and refusal to follow directives he viewed as age-based, (ECF No. 34 at 12)—do not qualify as protected activity under Title VII. No reasonable employee

25

could believe that complaints about the officers' misconduct, or about the School

District's handling of those complaints, involve conduct prohibited under Title VII.

The statute imposes no duty on employers to adopt particular procedures for

handling internal complaints. *See Cooper*, 819 F.3d 678 at 681 ("In defining with

great care and precision those behaviors that qualify as 'unlawful employment

practices,' the statute [Title VII] lays on employers no obligation to maintain any

particular procedures for handling internal complaints. Indeed, the relevant

provisions do not touch on the subject at all."). Nor does Title VII protect

whistleblower complaints about workplace mismanagement. *See Broomfield v.*

*Bronx Lebanon Special Care Ctr., Inc.*, No. 16-CV-10047 (ALC) (SLC), 2025 WL

902456, at *9 (S.D.N.Y. Mar. 25, 2025) ("The term 'protected activity' refers to

action taken to protest or oppose statutorily prohibited discrimination. Title VII

does not protect whistleblowers who complain about mismanagement." (citations

omitted)). And although Plaintiff may have held a good-faith belief that, in refusing

to discriminate against some officers due to their age, the conduct he was opposing

was indeed unlawful, it would be unlawful under a statute other than Title VII. *See*

42 U.S.C. § 2000e–2(a) (defining unlawful employment practices under Title VII as

discrimination based on "such individual's race, color, religion, sex, or national

origin," not age); *see also Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381,

391 (S.D.N.Y. 2011) (dismissing age-based discrimination and retaliation claims

asserted under Title VII, because "Title VII does not encompass claims for

employment discrimination on the basis of age").

But, as stated above, Plaintiff does plausibly allege that he engaged in protected activity through his informal complaints to Raimondi, and that the School District had knowledge of those complaints. At this stage, that is sufficient.

### 2. Plaintiff adequately pleads an adverse employment action that was causally connected to a protected activity.

Title VII's anti-retaliation provision prohibits retaliatory action that is "'materially adverse," meaning "employer actions serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Muldrow*, 601 U.S. at 357 (citation omitted and cleaned up). This standard "covers a broader range of conduct" than the adverse-action standard for discrimination claims and is not limited to actions that affect the terms and conditions of employment. *Vega*, 801 F.3d at 90 (internal quotation marks and citation omitted). Termination plainly qualifies as an adverse employment action. *Moore*, 722 F. Supp. 3d at 247. Also, "significantly diminished material responsibilities [qualify] as the sort of employment action sufficiently disadvantageous to constitute an adverse employment action in a Title VII [retaliation] case." *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (internal quotation marks and citation omitted). But "[a]ctions that are trivial harms—i.e., those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (internal quotation marks and citation omitted).

To plead causation, a plaintiff must plausibly allege a connection between the protected activity and the adverse action. *Vega*, 801 F.3d at 90 (citation omitted). An inference of causation may be "drawn when one considers the facts as a whole," such as allegations that the adverse actions "occurred against a backdrop of continuing antagonism and frustration of [plaintiff's] professional ambitions." *Duplan*, 888 F.3d at 626. Causation may be shown indirectly through temporal proximity or other circumstantial evidence, or directly through evidence of retaliatory animus. *Littlejohn*, 795 F.3d at 319. Although there is no bright-line rule defining when temporal proximity of the adverse action to the protected activity becomes too attenuated to infer a causal relationship, *id.*, "[a] few months is usually close enough." *Huda v. New York City Health & Hosps. Corp.*, No. 19-CV-11556 (AJN), 2021 WL 1163975, at *7 (S.D.N.Y. Mar. 26, 2021) (internal quotation marks and citation omitted).

Here, Plaintiff sufficiently alleges two materially adverse actions: his transfer to video monitoring and his termination, both of which would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Muldrow*, 601 U.S. at 357 (citation omitted and cleaned up). Termination is plainly adverse. *Moore*, 722 F. Supp. 3d at 247. Plaintiff also plausibly alleges that his transfer to video monitoring was undesirable, akin to a demotion, and would have deterred a reasonable worker from making a discrimination complaint. (ECF No. 1 ¶¶ 58–60). Courts have recognized that comparable reassignments accompanied by significantly diminished responsibilities may qualify as materially adverse in the

retaliation context. *See, e.g., Duplan*, 888 F.3d at 627 (finding that plaintiff adequately alleged retaliation claim under Title VII where, shortly after filing EEOC complaint, plaintiff's responsibilities were "so diminished" by defendant assigning him duties well below his civil service and functional titles); *see also Herling v. New York City Dep't of Educ.*, No. 13-CV-5287, 2014 WL 1621966, at *9 (E.D.N.Y. Apr. 23, 2014) (noting that Second Circuit has found reassignments and diminished responsibilities such as "assignment of lunchroom duty, reduction of class preparation periods," and "transfer from library to classroom teaching" qualify as adverse employment actions for purposes of a Title VII retaliation claim) (citation omitted).

Plaintiff also plausibly pleads an inference of causation based on the temporal proximity—mere days—between these adverse employment actions and his protected activity. Plaintiff alleges that on October 18, 2023, he complained to Raimondi about Barnes' racially charged comment, "Fuck you white mother fucker," and was told to "let it go." (ECF No. 1 ¶ 65). This response echoes Raimondi's earlier admonition to Plaintiff, after complaining of mistreatment by Defendants Pierce and Jones, to "let it go because he was not going to win because of his race." (*Id.* ¶ 47). Within days of the October 18 complaint, Plaintiff was transferred to video monitoring and then terminated on October 23, 2023. (*Id.* ¶¶ 68–70). Courts have found far longer time gaps sufficient to support an inference of causation. *See, e.g., Littlejohn*, 795 F.3d at 319–20 (finding demotion within days sufficient); *Vega*, 801 F.3d at 92 (finding gap of a few weeks to three months sufficient).

29

Thus, Plaintiff plausibly alleges that he suffered adverse employment actions causally connected to protected activities. The motion to dismiss the Title VII retaliation claim against the School District is DENIED.

## C. Hostile Work Environment Claim under Title VII

Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). "The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment ..., which includes requiring people to work in a discriminatorily hostile or abusive environment." *Littlejohn*, 795 F.3d at 320 (citation omitted).

To establish a hostile work environment under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (citation omitted). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (citation omitted).

30

Courts "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiff fails to plausibly allege a hostile work environment, because none of his allegations of mistreatment and discrimination, alone or taken together, were sufficiently severe or pervasive to alter his employment conditions and create an abusive working environment. As noted above, Plaintiff's allegations of discrimination are sufficient to meet the minimum threshold to support an inference of discrimination, but just barely so. Taken together, these collective remarks and actions are hardly "continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 321. For example, Plaintiff alleges that he "felt embarrassed and humiliated" by Defendant Jones' comparison of Plaintiff to Donald Trump. (ECF No. 1 ¶¶ 62–63). But that remark, while subjectively offensive to Plaintiff, cannot reasonably be found to be physically threatening or humiliating. Although Barnes' racially charged expletive—"Fuck you white mother fucker" (*id.* ¶ 65)—could arguably be so, it is neither objectively severe nor pervasive, even when viewed together with other remarks. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady

31

barrage of opprobrious racial comments." (cleaned up and citations omitted)); *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 561–62 (S.D.N.Y. 2022) (finding plaintiff fails to satisfy Title VII's high bar for race-based hostile work environment claim, despite alleging disparaging email about plaintiff, baseless investigation into plaintiff, statement labeling plaintiff as racist, and statement containing "numerous race-based false statements that injured Plaintiff").

Similarly, Plaintiff's other allegations of discriminatory conduct—being "berate[d]," (ECF No. 1 ¶ 44), not being invited to meetings, (*id.* ¶ 43), being interrogated and laughed at in one meeting, (*id.* ¶ 46), being ignored, (*id.* ¶ 69), being potentially denied representation at a grievance hearing, (*id.* ¶ 53), or having his complaints of alleged officer misconduct go unheeded or mishandled, (*id.* ¶¶ 46, 48, 64, 74)—did not plausibly render his workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris,* 510 U.S. at 21 (internal quotation marks and citation omitted). "Courts routinely hold that stray incidents of the nature alleged in this case (and, indeed, of a more serious nature) fail to support a hostile-work-environment claim under federal civil-rights statutes." *Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F. Supp. 3d 68, 101 (S.D.N.Y. 2024) (collecting cases); *see, e.g., Williams v. New York State Unified Ct. Sys. Off. of Ct. Admin.*, No. 16-CV-2061 (VSB), 2017 WL 4402562, at *7 (S.D.N.Y. Sept. 30, 2017) (finding no hostile work environment claim pled where allegations, even assuming they were motivated by discriminatory animus, include that plaintiff's subordinates "'openly challenged' his authority, disregarded his directives, and complained to

management, who, instead of remedying the situation, reprimanded Plaintiff and tried to convince him to relinquish his supervisory authority"). "Title VII is not a general civility code but rather forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (internal quotation marks and citation omitted).

Thus, the Court finds that Plaintiff fails to plausibly allege a hostile work environment claim under Title VII. The motion to dismiss the Title VII hostile work environment claim against the School District is GRANTED.

**D. Section 1983 Claims for Equal Protection Clause Violations**

The Equal Protection Clause of "[t]he Fourteenth Amendment, as made actionable by 42 U.S.C. § 1983, provides public employees with the right to be free from discrimination." *Buon*, 65 F.4th at 78 (internal quotation marks and citation omitted). "Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." *Vega*, 801 F.3d at 87 (citation omitted). "To state a claim under § 1983, a plaintiff must allege two elements: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law." *Vega*, 801 F.3d at 87–88 (internal quotation marks and citations omitted). But an individual may be held liable under § 1983 only if they are "personally involved in

33

the alleged deprivation." *Littlejohn*, 795 F.3d at 314 (citing *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)).

Here, Plaintiff brings Section 1983 claims for discrimination, retaliation, and hostile work environment against Defendants Smith, Jones, Pierce, and Middleton, in their individual capacities, for actions allegedly taken "under color of state law." (ECF No. 1 ¶ 119). Defendants argue that these claims should be dismissed because Plaintiff has failed to allege the personal involvement of each individual Defendant in Plaintiff's alleged constitutional injuries. (ECF No. 24 at 25). The Court addresses each of Plaintiff's claims in turn.

1. **Plaintiff's discrimination and retaliation claims under Section 1983 fail against all individual Defendants, except Smith.**

As in Title VII discrimination claims, courts "analyze … Section 1983 discrimination claims under the familiar three-step burden-shifting framework articulated in *McDonnell Douglas*." *Buon*, 65 F.4th at 78 (citation omitted). Thus, for a § 1983 discrimination claim to survive a motion to dismiss, a plaintiff "must plausibly allege a claim under the same standards applicable to a Title VII claim— and that the adverse action was taken by someone acting 'under color of state law.'" *Vega*, 801 F.3d at 88; *see also Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (noting that elements of equal protection and Title VII claims "are generally the same," so that "the two must stand or fall together" (citations omitted)).

A retaliation claim is also actionable under § 1983, based on a violation of the Equal Protection clause, "against a supervisor who, acting under color of law,

34

retaliates against him for opposing discrimination in the terms of his employment." *Vega*, 801 F.3d at 81–82. "As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Id.* at 91. For a retaliation claim under § 1983 to survive a motion to dismiss, a "plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination." *Id.*

Here, Plaintiff brings discrimination and retaliation claims under § 1983 against Defendants Smith, Jones, Pierce, and Middleton, in their individual capacities, for actions allegedly taken "under color of state law." (ECF No. 1 ¶ 119). Defendants do not dispute that the individual Defendants acted "under color of state law," (ECF No. 24 at 25–30), and indeed public-school employees are generally considered persons acting "under color of state law." *Vega*, 801 F.3d at 89. Because the Court has already found Plaintiff's allegations sufficient to meet the minimal pleading burden for discrimination and retaliation under Title VII, the only question is whether Plaintiff alleges sufficient facts to show that each individual Defendant was personally involved in that alleged discrimination and retaliation. *Littlejohn*, 795 F.3d at 314 ("[A]n individual may be held liable under … [§] 1983 only if that individual is personally involved in the alleged deprivation."). Personal involvement can be established by showing that the defendant: (1) "participated directly in the alleged constitutional violation," (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "created a

35

policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "was grossly negligent in supervising subordinates who committed the wrongful acts," or (5) "exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (citing *Back*, 365 F.3d at 127).

Construing all reasonable inferences in his favor, Plaintiff plausibly alleges that Defendant Smith was personally involved in one of the adverse employment and retaliatory actions that form the basis, respectively, for his discrimination and retaliation claims. Specifically, Plaintiff alleges that Smith, his supervisor, transferred him to video monitoring, soon after he made an informal complaint about his discriminatory treatment to Raimondi. (ECF No. 1 ¶¶ 18, 69). Plaintiff also alleges that Smith transferred him to video monitoring in retaliation for opposing his discriminatory treatment. (*Id.* ¶ 69). Thus, Plaintiff sufficiently pleads discrimination and retaliation claims under § 1983 against Defendant Smith for her personal involvement in Plaintiff's transfer. *See Littlejohn*, 795 F.3d at 314 (finding only one of the defendants, who was personally involved in the decision to demote plaintiff, liable for discrimination under § 1983, but not others, who were not alleged to play a role in the demotion).

But Plaintiff fails to allege any facts that Defendants Pierce, Jones, and Middleton were personally involved in either the decision to transfer or terminate him. Plaintiff alleges that Pierce, a principal at the School District, did not take Plaintiff's complaints of misconduct by certain Black security officers seriously and

36

instead interrogated and ridiculed Plaintiff. (ECF No. 1 ¶¶ 20, 46). Similarly, Jones, Plaintiff's supervisor, allegedly ignored Plaintiff's complaints of misconduct by certain Black security officers, and instead interrogated and laughed at him. (*Id.* ¶¶ 19, 46). Days before Plaintiff's termination, Jones further asked Plaintiff why he picked on certain people and told him he reminded her of Donald Trump. (*Id.* ¶ 62). But none of these allegations state that either Pierce or Jones was personally involved in the decision to transfer or terminate Plaintiff.  *See, e.g., Williams*, 2017 WL 4402562, at *9 (dismissing discrimination claim under § 1983 against individual defendants for failure to allege their personal involvement in plaintiff's suspension, probation, or termination); *Falcon v. City Univ. of New York*, No. 15-CV-3421 (ADS)(ARL), 2016 WL 3920223, at *12 (E.D.N.Y. July 15, 2016) (dismissing discrimination claims under § 1983 against individual defendants, where proposed complaint was devoid of any allegation that they took part in decision to not promote plaintiff, then to demote plaintiff, or that they had authority over personnel decisions); *Sherman v. City of New York*, No. 18-CV-6907 (LDH), 2020 WL 6873453, at *7 (E.D.N.Y. Nov. 23, 2020) (finding plaintiff fails to state a discrimination claim under § 1983 against individual defendants, who were not alleged to authorize, acquiesce, or otherwise be personally involved in the adverse employment action, i.e., plaintiff's assignment to perform menial and janitorial tasks); *Tyson v. Town of Ramapo*, No. 17-CV-4990 (KMK), 2019 WL 1331913, at *17 (S.D.N.Y. Mar. 25, 2019) (finding plaintiff sufficiently pleaded discrimination claims under § 1983 against individual defendants, who were personally involved in

37

plaintiff's termination by threatening to terminate her, actually terminating her, and processing her termination, but dismissing them against others, whom plaintiff failed to allege had any impact on the decision to terminate her or had a say in her termination).

Similarly, Plaintiff fails to allege that Middleton, a Board of Education Trustee, was personally involved in either his transfer or termination. His only allegation against her consists of a phone call on October 4, 2023, during which Middleton told Plaintiff that she heard he was a racist and asked, "Are you a racist?" (ECF No. 1 ¶ 64). Such a statement is insufficient to allege personal involvement in Plaintiff's alleged unlawful transfer or termination. Even assuming the Board of Education (of which Middleton was a member) made the decision to terminate Plaintiff's employment, Plaintiff fails to allege that as a member of the Board, Middleton played a decision-making role in his termination. *See Falcon*, 2016 WL 3920223, at *11 ("When an allegedly discriminatory action is taken by an entity, such as the Board of Education, a participant in the decision making process may be held liable for that action if the plaintiff can demonstrate that the individual defendant acted with an improper motive and played a meaningful role in the decision making process." (cleaned up and citation omitted)).

For the same reasons stated above relating to Plaintiff's discrimination and retaliation claims under Title VII, the Court finds that Plaintiff sufficiently pleads facts to state a claim of discrimination and retaliation under Section 1983 against Defendant Smith. But the facts fail to allege any personal involvement of

38

Defendants Jones, Pierce, or Middleton in Plaintiff's transfer or termination. Thus, the motion to dismiss the Section 1983 discrimination and retaliation claims is GRANTED against Defendants Jones, Pierce, and Middleton, but DENIED as to Defendant Smith.

### 2. Plaintiff's hostile work environment claim under Section 1983 fails against all Defendants.

Section 1983, through its application of the Equal Protection Clause of the Fourteenth Amendment, "protect[s] public employees from various forms of discrimination, including hostile work environment … on the basis of race." *Littlejohn*, 795 F.3d at 320 (internal quotation marks and citation omitted). The same standard for a hostile work environment under Title VII applies to that under Section 1983. *Id.* To state a hostile work environment claim under § 1983, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted). An individual may be held liable under § 1983 only if they are "personally involved in the alleged deprivation." *Littlejohn*, 795 F.3d at 314.

For the same reasons stated above relating to Plaintiff's hostile work environment claim under Title VII, the Court finds that Plaintiff fails to plead facts to state a plausible claim that he was subjected to a hostile work environment under Section 1983, let alone that any individual Defendant was personally

39

involved in creating one. The motion to dismiss the hostile work environment claim under Section 1983 against all individual Defendants is GRANTED.

### E. State-law Claims under the NYSHRL

Defendants argue that Plaintiff's state-law claims under the NYSHRL (Counts 4–6) should be dismissed because Plaintiff failed to comply with the notice-of-claim requirements of Municipal Law 50-e and Education Law § 3813. (ECF No. 24 at 30–31). The Court agrees that Plaintiff's state-law claims under the NYSHRL fail, but only partly because of the notice requirements. As explained below, Plaintiff's failure to meet the notice-of-claim requirements under Education Law § 3813 warrants dismissal of most of Plaintiff's state-law claims, except those against Defendant Pierce who falls outside the notice requirements. But the NYSHRL claims against Defendant Pierce ultimately fail because she cannot be held individually liable under that statute.

1. **Plaintiff's failure to allege compliance with the notice-of-claim requirements under Education Law § 3813 warrants dismissal of his NYSHRL claims against all Defendants, except Pierce who falls outside the notice requirements.**

"We start with the general rule that in a federal court, state notice-of-claim statutes apply to *state*-law claims." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151 (1988)). "General Municipal Law § 50–e (1)(a) requires service of a notice of claim within 90 days after the claim arises '[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation.'" *Margerum v. City of Buffalo*, 24

40

N.Y.3d 721, 730 (2015). Section 50–e applies to tort claims against a "public corporation," which includes school districts, and their officers and employees. *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 602 (S.D.N.Y. 2011). But "the General Municipal Law does not encompass a cause of action based on the Human Rights Law … [because] [h]uman rights claims are not tort actions under section 50–e and are not personal injury, wrongful death, or damage to personal property claims under section 50-i." *Margerum*, 24 N.Y.3d at 730 (citations omitted). Thus, "there is no notice of claim requirement" under General Municipal Law § 50–e for a NYSHRL claim. *Id. See also Winbush v. New York City Dep't of Educ.*, No. 1:23-CV-01320-LTS, 2025 WL 2624350, at *14 (S.D.N.Y. Sept. 10, 2025).

But the New York Education Law § 3813(1) does apply to the NYSHRL claims, and Plaintiff's failure to allege compliance with its notice-of-claim requirement bars nearly all his state-law claims for that reason alone. "Section 3813 requires a plaintiff to file a notice of claim within three months after accrual of the claim and prior to initiating a lawsuit against a school, school district, board of education, or education officer." *Winbush*, 2025 WL 2624350, at *14. Section 3813(1)'s "notice of claim requirement applies to employment discrimination claims against school districts and their officers under the NYSHRL." *United States v. New York City Dep't of Educ.*, No. 16-CV-4291 (LAK), 2017 WL 1319695, at *1 (S.D.N.Y. Apr. 4, 2017) (cleaned up and citation omitted). But "[c]ourts have found that principals do not qualify as officers for purposes of Section 3813." *Winbush*, 2025 WL 2624350, at *14 (citation omitted).

41

Here, Plaintiff agrees that § 3813 applies to his NYSHRL claims but argues that his EEOC charge (filed in August 2024) substitutes for such notice. (ECF No. 34 at 15). But an EEOC charge can only serve as such a substitute if it "puts the school district on notice of the precise claims alleged," is "served on the governing board of the district," and "is served within the statutory time period." *Brtalik v. South Huntington Union Free Sch. Dist.*, 2010 WL 3958430, at *5 (E.D.N.Y. Oct. 6, 2010); *see also Ximines v. George Wingate High Sch.*, No. 05CV1214 (ILG), 2006 WL 2086483, at *12 (E.D.N.Y. July 25, 2006), *aff'd in part, vacated in part, remanded*, 516 F.3d 156 (2d Cir. 2008) (finding EEOC filings did not fulfill notice of claim requirement under Section 3813, where filings were sent to defendant after three-month filing deadline passed). Even assuming the EEOC charge provides notice of the precise claims alleged, Plaintiff fails to allege in his Complaint that he timely served the EEOC charge on the proper governing board. Indeed, Plaintiff's own allegations state that he filed his complaint with the EEOC on August 8, 2024, more than nine months after his termination on October 23, 2023. (ECF No. 1 at ¶¶ 8, 79).

Recognizing the untimeliness of his EEOC charge, Plaintiff requests leave to serve a late notice under Section 3813. (ECF No. 34 at 15). The Court declines to do so, as it has no authority to grant such a request made ten months after the one-year statute of limitations under Section 3813 expired.[4] *See* N.Y. Educ. L. § 3813(2–

---

[4] Under N.Y. Educ. L. § 3813(2–b), Plaintiff has a one-year statute of limitations to sue the School District and its officers, which began to run on the date of his termination, the latest adverse employment action resulting in ascertainable damages. *See Williams v. New York City Dep't of Educ.*, No. 19 CIV. 1353 (CM), 2019 WL 4393546, at *19 (S.D.N.Y. Aug. 28, 2019) ("Discrimination

b) (imposing one-year statute of limitations on any cause of action arising against school district or board of education). Although a court may extend the time to serve a notice of claim, "[t]he extension shall not exceed the time limited for the commencement of an action by the claimant against any district or any such school." *Ximines*, 2006 WL 2086483, at *10 (citing N.Y. Educ. L. § 3813(2–a)). "This statutory limitation to the Court's power to extend the time to serve notice of claim divests the court of authority to grant an extension after the statute of limitations for the claim expires." *Id.* (citations omitted). *See also Biggers v. Brookhaven-Comsewogue Union Free Sch. Dist.*, 127 F. Supp. 2d 452, 454–55 (S.D.N.Y. 2001) ("[N]o action or proceeding [under Section 3813] may be prosecuted or maintained against any school district or board of education unless a notice of claim has been presented to the governing body, and this court may not disregard its pronouncement." (internal quotation marks and citation omitted)). "Notice of claim requirements are construed strictly by New York state courts" and failure to comply with them "ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94 (internal quotation marks and citations omitted).

The motion to dismiss the NYSHRL claims is GRANTED against all Defendants, except for Defendant Pierce. As noted above, "principals do not qualify as officers for purposes of Section 3813." *Winbush*, 2025 WL 2624350, at *14

---

claims under the NYSHRL and NYCHRL accrue under Section 3813 when an employer takes an adverse employment action that results in readily ascertainable damages." (citations omitted)). Plaintiff alleges that he was terminated on October 23, 2023, (ECF No. 1 at ¶ 79), so his one-year statute of limitations expired on October 23, 2024. Plaintiff did not request leave to serve a late notice under Section 3813 until ten months later. (ECF No. 34 at 15).

(citation omitted). Thus, the notice-of-claim requirement under § 3813(1) does not bar Plaintiff's NYSHRL claims against Defendant Pierce, a high school principal. (ECF No. 1 ¶ 20). The Court will therefore assess whether Plaintiff adequately pleads claims under the NYSHRL against Defendant Pierce.

### 2. Plaintiff fails to sufficiently plead Defendant Pierce's individual liability, warranting dismissal of his NYSHRL claims against her.

Under the NYSHRL, a person may be individually liable either as the "employer," N.Y. Exec. Law § 296(1)(a), or "if he or she aids, abets, incites, compels or coerces the discriminatory conduct," N.Y. Exec. Law § 296(6). *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 53 (2d Cir. 2014) (cleaned up and citation omitted). An "employer" is defined as one who has "ownership interests in the [employer]" or "do[es] more than carry out personnel decisions of others." *Id.* (citation omitted). Further, a "supervisor is an employer for purposes of establishing liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to [the] discrimination." *Feingold*, 366 F.3d at 157 (internal quotation marks and citation omitted). To be liable as an aider and abettor, one need not be a supervisor but may be a co-worker without authority to hire or fire the plaintiff. *Id.* at 158. But a person who aids and abets discriminatory conduct must also "actually participate[] in the conduct giving rise to a discrimination claim." *Id.* (citation omitted). *See also Brown v. New York City Transit Auth.*, No. 22-CV-02949 (ALC), 2024 WL 1347283, at *7 (S.D.N.Y. Mar. 29, 2024).

Here, Plaintiff does not allege that Defendant Pierce is an employer under the NYSHRL, either through an ownership interest in the School District or as Plaintiff's supervisor. (*See generally* ECF No. 1). Nor does Plaintiff allege that Pierce had the power or authority to hire or fire him, or that she had the ability to do anything more than "carry out personnel decisions" made by the Board of Education or the School District. *See Edwards v. Jericho Union Free Sch. Dist.*, 904 F. Supp. 2d 294, 304 (E.D.N.Y. 2012) (finding that school principals could not be held liable as "employers" or "supervisors" under NYSHRL absent allegations of authority to hire or fire plaintiff (citation omitted)).

Although a closer call, Plaintiff's claim against Defendant Pierce as an aider and abettor under the NYSHRL also fails. As discussed above, Plaintiff does not adequately allege that Pierce was personally involved in the alleged discrimination, retaliation, or hostile work environment under Section 1983. *See* Section V.D.1–2, *supra*. That failure is dispositive here too, because "[t]he requirement of personal involvement applies to the aiding and abetting provision of the Human Rights law as well." *Cater v. New York*, 316 F. Supp. 3d 660, 674 (S.D.N.Y. 2018) (citation omitted); *see also Tyson*, 2019 WL 1331913, at *19 (dismissing NYSHRL claims against individual defendants for the same reason the court dismissed analogous § 1983 claims for lack of personal involvement in plaintiff's termination).

But even if Pierce had been personally involved in the alleged discriminatory conduct, the claim would still fail. Courts in this Circuit are divided on whether the NYSHRL permits an individual to be held liable for aiding and abetting her own

45

conduct. *See Boyce v. Weber*, Case No. 19-cv-3825 (JMF), 2020 WL 5209526, at *2 (S.D.N.Y. Sept. 1, 2020) (collecting cases).[5] The New York Court of Appeals has not definitively answered that question. But the Appellate Division has. The First, Second, and Third Departments have each held that an individual cannot aid and abet her own violation of the Human Rights Law, and that aider-and-abettor liability requires an underlying violation by another party. *See Hardwick v. Auriemma,* 983 N.Y.S.2d 509, 513 (N.Y. App. Div. 2014) (finding by the First Department that "an individual cannot aid and abet his or her own violation of the Human Rights Law")*; Matter of Med. Express Ambulance Corp. v. Kirkland,* 913 N.Y.S.2d 296, 299 (N.Y. App. Div. 2010) (same by the Second Department)*; Strauss v. N.Y. State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (N.Y. App. Div. 2005) (same by the Third Department). Those decisions are not binding here. But when the state's highest court has not spoken, intermediate appellate decisions are "a basis for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Boyce*, 2020 WL 5209526, at *2 (quoting *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005)).

---

[5] The courts that have held that a defendant can aid and abet her own conduct under the NYSHRL have largely done so because of the Second Circuit's decision in *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995). *See, e.g., Johnson v. Cnty. of Nassau*, 82 F.Supp.3d 533, 536 (E.D.N.Y. 2015). But *Tomka* does not control. There, the Second Circuit reinstated the underlying hostile work environment claim against the employer, the Seiler Corporation, while also permitting the NYSHRL aiding-and-abetting claims against individual co-workers. *Tomka*, 66 F.3d at 1307, 1317. It did not address whether § 296(6) permits personal liability when no employer remains liable for the underlying NYSHRL violation and the individual's alleged liability rests solely on her own conduct.

46

Under that rule, Pierce cannot aid and abet her own alleged discriminatory conduct because "[f]atally, Plaintiff has not shown an underlying NYSHRL or NYCHRL violation exists, which is required to aid or abet." *Brown*, 2024 WL 1347283, at \*12 (citing *Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order)); *see also Cater*, 316 F. Supp. 3d at 674 ("An aiding and abetting claim against the Governor pursuant to N.Y. Exec. Law § 296(6) must therefore fail with them, since a predicate for aider and abettor liability under this provision is employer liability." (internal quotation marks and citation omitted)). Because no underlying NYSHRL claim against an employer or supervisor survives, the aiding-and-abetting claim against Pierce fails as well.

Accordingly, the motion to dismiss the claims against Defendant Pierce under the NYSHRL is GRANTED.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The following claims are DISMISSED: (1) Plaintiff's hostile work environment claims under Title VII (Count 3) and Section 1983 (Count 7) against all Defendants; and (2) Plaintiff's discrimination, retaliation, and hostile work environment claims under the NYSHRL against all Defendants (Counts 4, 5, and 6). The following claims may proceed: (1) Plaintiff's discrimination and retaliation claims under Title VII (Counts 1 and 2) and (2) Plaintiff's discrimination and retaliation claims under Section 1983 against Defendant K. Veronica Smith (Count 7).

47

Plaintiff may file an amended complaint within **30 days** of this Opinion and Order. If Plaintiff does not file an amended complaint within that time, Defendants Mount Vernon City School District and K. Veronica Smith shall **answer the remaining claims within 14 days thereafter.**

The Clerk of Court is respectfully directed to close the gavel associated with ECF No. 23. The Clerk of Court is also directed to terminate Defendants Beverly Jones, Pauline Pierce, and Lynne Middleton on the docket of this action.

    **SO ORDERED.**

DATED:    White Plains, New York
           March 27, 2026

VICTORIA REZNIK
United States Magistrate Judge